UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN AND CAROL SMITH,

    Plaintiffs,

                                Case No. 10-cv-12312

                                Paul D. Borman
                                United States District Judge

v.

STATE FARM FIRE AND CASUALTY
COMPANY,

    Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER/INJUNCTIVE RELIEF

This matter is before the Court on Plaintiffs' motions for a temporary restraining order (Dkt. No. 7) and/or for injunctive relief. (Dkt. No. 8.) Defendant State Farm ("State Farm") has filed a response to Plaintiffs' motions (Dkt. No. 18) and Plaintiffs filed a reply (Dkt. No. 19.) A hearing was held in this matter on August 2, 2010 and continued on August 16, 2010. For the reasons that follow, the Court grants in part Plaintiffs' request for injunctive relief.

**I.    BACKGROUND**

On September 23, 2009, Plaintiffs Kevin and Carol Smith suffered a fire at their home located at 2077 Hartwick Lane, Howell, Michigan. (Compl. ¶ 6.) The fire was caused by an electrical outlet in the basement that had burned itself out, resulting in smoke damage to their residence. (Defendant's Response in Opposition to Plaintiffs' Motion for a Temporary Restraining

1

Order and For a Preliminary Injunction, Dkt. No. 18, 1.) Plaintiffs state that they "suffered a serious fire which left them homeless and without usable personal property." (Pls.'s Mot. Prelim. Inj. 4.)

Plaintiffs made a claim with their insurance carrier, Defendant State Farm, who acknowledged the loss as covered under the policy and began payments to Plaintiffs for Alternative Living Expenses ("ALE") and approximately $29,000 to repair the residence. (Compl. ¶¶ 9-10; Def.'s Resp. 1; Pls.'s Mot. Ex. A (Policy Excerpts); Def.'s Resp. Ex. C, Policy.) Plaintiffs arranged for temporary alternate housing through CRS Temporary Housing ("CRS") and relocated to 1859 Cobble Court, Brighton, MI, at a rental cost of $3,000 per month, which State Farm paid directly to Plaintiffs' landlord. (Compl. ¶ 10; Pls.'s Mot. 4, Ex. B; Pls.'s Reply Ex. D.) According to Plaintiffs, State Farm made some payments for certain personal property items claimed to have been damaged in the fire but failed to make payments for "the bulk of the dwelling loss." (Compl. ¶ 11; Pls.'s Mot. 4.)

On or about January 13, 2010, in view of the disagreement between Plaintiffs and State Farm as to the amount of the claimed loss from the fire, the parties agreed to submit the dispute to appraisal pursuant to the applicable provisions of the policy and MCL § 500.2833. (Compl. ¶¶ 12, 13; Pls.'s Mot. Ex. C.) Plaintiffs appointed Stewart Shipper as their appraiser and State Farm appointed Dave Berger. (Compl. ¶¶ 13, 14; Pls.'s Mot. Ex. D.) State Farm agreed to continue to pay Plaintiffs' ALE expenses, including rent, while the parties proceeded to appraisal. (Pls.'s Mot. Ex. D.)

Sometime in early February, in response to a request from Plaintiffs' appraiser, Mr. Shipper, a company called Sanit-Air conducted an air quality assessment on the home. (Def.'s Mot. Ex. A (the "Sanit-Air Report").) By letter dated February 17, 2010, State Farm informed Plaintiffs that

2

the halting of repairs on the home to allow for the Sanit-Air assessment, the results of which were not anticipated until early March, had created unnecessary delays in the repairs of the home. (Pls.'s Mot. Ex. E.) State Farm informed Plaintiffs that it had agreed to continue paying ALE expenses during the appraisal process, which it stated it was not contractually obligated to do, on the word of Plaintiffs' attorney that the process would move along quickly. (*Id*.) State Farm indicated that its appraiser had completed his appraisal of the structural repairs and but that Mr. Shipper's report had not been received. State Farm concluded by informing Plaintiffs that based upon the client and appraiser delays, State Farm was ending ALE payments effective February 20, 2010. (*Id*.)

On March 15, 2010, Sanit-Air provided its report to Plaintiffs' appraiser, Mr. Shipper, indicating significant air quality issues in the home, including "a virtual chemical soup" identified in the sample taken from the basement. (Defs.'s Mot. Ex. A.) The report noted, in addition to the presence of these chemical contaminants, significant carbon material, related to the soot from the smoke/fire, on multiple surfaces throughout the home and throughout the duct work. (*Id*.) The report stated that the residual carbon materials were "representative of substandard restoration." (*Id*.) The report also indicated exposure effects, from the high levels of contaminants, of eye and respiratory irritation, headaches, drowsiness, general malaise, etc. (*Id*.) The report recommended extensive remedial work, beginning in the attic and moving to the basement, which included, among other things, removal and replacement of insulation, removal of carpeting and padding, removal of all wood trim, including moldings, window seats and baseboards, replacement of the kitchen counters and re-sanding and refinishing of cabinets which had been repainted as part of the restoration. (*Id*. 2-3.)

By letter dated March 18, 2010, State Farm informed Plaintiffs that the Sanit-Air report

3

presented items that were not appropriate for the appraisal process because they involved losses excluded by the policy, among other things, contaminants. (Compl. ¶ 17; Pls.'s Mot. Ex. F.) State Farm stated: "[W]e are ending the appraisal process and [] formally denying any further liability for this claim. After these coverage disputes are resolved, this matter may be appropriate for appraisal." (Pls.'s Mot. Ex. F.) State Farm also informed Plaintiffs that they would not pay Plaintiffs' storage fees after April 1, 2010 and would not pay Plaintiffs' ALE expenses after March 31, 2010. (*Id*.) Plaintiffs state that State Farm instructed the ALE provider to pick up all of the rental furniture at Plaintiffs' rental home, "leaving them with an empty house without even a bed for their school age children to sleep in." (Compl. ¶ 18.)

On April 30, 2010, Plaintiffs wrote to State Farm and asked them to reconsider denial of the claim. (Pls.'s Mot. Ex. K.) In the letter, Plaintiffs explained their understanding that State Farm had withdrawn from the appraisal process because it believed, based on its review of the Sanit-Air report, that the damage claimed was due to contamination which was not covered under the policy. (*Id*.) In an effort to address this issue, Plaintiffs attached an addendum report prepared by Sanit-Air which identified those items of damage that Sanit-Air found to have been related to the fire, including soot and smoke damage, as opposed to damage that may have been pre-existing in the home and not related to the fire. (*Id*; Def.'s Mot. Ex. D.) Plaintiffs concede in their letter that they were "only seeking an appraisal of those items of damage related to the fire, and those items identified in [the Sanit-Air report] as due to other causes are not intended to be part of the appraisal proceedings." (*Id*.) On May 5, 2010, State Farm responded to Plaintiffs' request, refusing to reconsider its denial and indicating that Plaintiffs had refused to allow State Farm's own expert to inspect regarding the Sanit-Air report, in violation of the Policy provision requiring the insured to

4

"exhibit the damaged property." (Pls.'s Mot. Ex. G; Ex. K.)

On May 12, 2010, Plaintiffs responded to State Farm's May 5, 2010 letter, attempting to "make crystal clear" Plaintiffs' position on "what appears to be a misunderstanding." (Pls.'s Mot. Ex. K, 9-10.) Plaintiffs reiterated a discussion that had transpired with State Farm the week before in which State Farm had indicated a desire to have an environmental expert evaluate the condition of the home so that State Farm could respond to the Sanit-Air report. (*Id*.) Plaintiffs indicated that they had no objection to State Farm engaging its own environmental expert as part of the appraisal process, but objected to State Farm's withdrawal from the appraisal process and assertion of denial of the claim. (*Id*.) Plaintiffs indicated that they looked "forward to having the appraisers move forward with the resolution of the claim and welcome inspections of the property by experts as part of the appraisal, which is the claim resolution process under Michigan law." (*Id*.)

State Farm has continued its refusal to participate in the appraisal process and stopped ALE payments as of March 31, 2010, as they indicated they would. As a consequence, Plaintiffs, who claim they have no assets and no way to pay the rent on their rental home, fell four months behind in their $3,000/month rent (plus late fees) and were served with a demand for possession from their landlord, requesting that they pay the amount owed, $12,400, or vacate the premises by July 27, 2010. The notice states that failure to pay or move out may result in eviction proceedings. (Pls.'s Reply, Ex. D.)

At the continuation of the hearing on this matter on August 16, 2010, Plaintiffs' counsel informed the Court that in fact Plaintiffs' landlord has sold the rental home on Cobble Street Court and further informed the Court that Plaintiffs must vacate the rental home by the end of August. Plaintiffs' counsel informed the Court that Plaintiffs have arranged for, although they have not

5

officially signed a lease, the rental of an alternate property at the same cost ($3,000 per month) for a period of three months.

Plaintiffs have submitted the Affidavit of Kevin and Carol Smith (Dkt. No. 21) which indicates that the family's monthly living expenses, including continuing payments on the mortgage on their smoke-damaged home to avoid foreclosure on that home, meet or slightly exceed the monthly income earned by Mr. Smith in his job as an electrician for the Oscar W. Larsen Company. (Affidavit of Kevin Smith and Carol Smith, August 7, 2010, Dkt. No. 21, ¶¶ 2-4.) Plaintiffs currently have $977.32 in their checking account and two additional assets, Kevin Smith's interest in his employer's pension and profit sharing plan and Kevin Smith's 401(k) Plan. (*Id.* ¶ 5.) The Court learned at the August 16, 2010 hearing that Kevin Smith's present interest in his employer's pension and profit sharing plan is approximately $85,000 but that he cannot spend it or withdraw it, and his 401(k) is valued at approximately $6,800. Plaintiffs' affidavit further states that they are without the benefit of family or friends who could take in their family of six while repairs on their smoke-damaged home continue. (*Id.* ¶ 8.) Plaintiffs also indicate that they are unable to afford rental furniture for the rental property and they seek an additional $1,000 per month to cover that cost.[1]

## II.   STANDARD OF REVIEW

The purpose of preliminary injunctive relief is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Certified Restoration Dry Cleaning Network,*

---

[1] Under the prior ALE arrangement with State Farm, State Farm directly paid both Plaintiffs' rent and monthly charge for rental furniture, which together amounted to approximately $4,000 per month. At the August 16, 2010 hearing, Plaintiffs' counsel indicated to the Court that the household items taken from Plaintiffs' smoke-damaged home are in storage and have not yet been cleaned or repaired. Counsel for State Farm did not dispute this statement.

*L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). For this reason:

> [A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. Accordingly, a party is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits.

*Tenke, supra* at 542 (internal quotation marks and citations omitted).

When considering a motion for injunctive relief, the Court must balance the following factors: (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a TRO, (3) whether granting the TRO would cause substantial harm to others, and (4) whether the public interest would be served by granting the TRO." *Detroit Intern. Bridge Co. v. Federal Highway Admin.*, 666 F. Supp. 2d 740, 746 (E.D. Mich. 2009) (citing *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir.2008)). These four factors must be "balanced" and are not "prerequisites:"

> These four considerations are factors to be balanced, not prerequisites that must be met. The district judge is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue. However, it is generally useful for the district court to analyze all four of the preliminary injunction factors, especially since our analysis of one of the factors may differ somewhat from the district court's.

*Tenke*, *supra* at 542 (internal quotation marks and citations omitted).

The Sixth Circuit does not require a heightened showing of the prerequisites for relief where the injunction is mandatory (i.e. seeks to alter the status quo by ordering the performance of an act) as opposed to prohibitory (i.e. one that maintains the status quo). In *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 348 (6th Cir. 1998), the court noted that the Sixth Circuit had "rejected any particular magic in the phrase

status quo" and rather had explained that "[t]he focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo," and had recognized that "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury." 163 F.3d at 348 (quoting *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir.1978)). The court in *United Food* concluded:

> We therefore see little consequential importance to the concept of the status quo, and conclude that the distinction between mandatory and prohibitory injunctive relief is not meaningful. Accordingly, we reject the Tenth Circuit's "heavy and compelling" standard and hold that the traditional preliminary injunctive standard-the balancing of equities-applies to motions for mandatory preliminary injunctive relief as well as motions for prohibitory preliminary injunctive relief.

163 F.3d at 348. *See also Bay County Democratic Party v. Land,* 347 F. Supp. 2d 404, 424 (E. D. Mich. 2004) (recognizing that "[t]he plaintiffs' burden is the same irrespective of whether the relief sought is mandatory or prohibitive.")

In their motion for a TRO and preliminary injunctive relief, the Smiths "seek to preserve the state of affairs that existed prior to State Farm's termination of additional living expense (ALE) benefits and withdrawal from appraisal." (Pls.'s Mot. 8.) The Smith's seek an order: (1) directing State Farm to continue to participate in statutory appraisal process; and (2) directing State Farm to continue ALE payments for the next three months while the appraisal process continues.[2]

## III.    ANALYSIS

---

[2] In their motion, Plaintiffs also requested that the Court order State Farm "to pay the currently undisputed portion of the loss, with balance determined by the appraisal process." (Pls.'s Mot. 8.) Plaintiffs did not press this claim at the hearings and in any event the court declines to entertain this third claim for relief, as it clearly is not the proper subject of a motion for preliminary injunctive relief. Nor does the Court address the issue of the amounts Plaintiffs claim are owed for the intervening months, April, May, June and July, when the appraisal process appears to the Court to have been halted due to conduct by both parties impeding the process.

A. **Substantial Likelihood of Success on the Merits**

1. **Compelling State Farm's continued participation in the appraisal process.**

While this Court will apply federal law regarding the factors to be considered in granting a preliminary injunction, it must "apply Michigan law to determine whether Plaintiff has met the first of these factors by demonstrating a substantial likelihood of success on the merits of his underlying diversity action." *Tenke*, *supra* at 541. (quoting *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) and *Lantech.com v. Yarbrough*, 247 F. App'x. 769, 2007 WL 2669115 at *5 (6th Cir.2007) (unpublished)).

The essence of the dispute between Plaintiffs and State Farm relates to the characterization of Plaintiffs' claim following the findings of the Sanit-Air report. State Farm, in its motion papers, appears to claim that the Sanit-Air report, which was ordered by Plaintiffs' appraiser as part of the appraisal process, was a separate and distinct claim, seeking coverage for loss related to the contamination noted in the report, which is expressly excluded under the Policy. In summary State Farm argues the following:

> In response to this report, which represented a separate claim under the policy, State Farm indicated that, in its view, the damages outlined in the report, including the "chemical soup," were not the result of a relatively small amount of smoke damage, but were caused by contamination emanating from an unknown source unrelated to the original claim. Accordingly, less than one (1) week after receiving the report, State Farm sent a letter denying liability for the claim, as contamination is specifically excluded by the policy. State Farm also removed the matter from appraisal at that time because, as coverage questions existed, particularly related to this contamination claim, appraisal was no longer an appropriate vehicle to resolve the dispute.

(Def.'s Resp. 2.) Although Plaintiffs never filed a new or separate claim, State Farm views the damage items outlined in the Sanit-Air report as a separate "claim" that State Farm is denying based on policy exclusions. (The State Farm position is well summarized in Plaintiffs' Reply Brief at pp.

2-3.)

Plaintiffs respond that the Sanit-Air report, which was commissioned by Plaintiffs' appraiser during the appraisal process, is not a new claim but is a part of the loss appraisal process, in which State Farm agreed to participate, relating to a loss that State Farm already agreed was covered. Plaintiffs claim that disagreements concerning the "scope of the repair or replacements" necessitated by the covered loss are not "coverage" issues, which are to be decided by the court, but are disputes over "the amount of loss" and are properly decided by the appraisers. Plaintiffs expressly concede that any damages that are determined by the appraisal process to flow not from the fire/smoke damage but from some other source, such as contaminants, are not covered and are not properly considered in the appraisal process. In essence, Plaintiffs are arguing that if the appraisers are instructed only to assess damages flowing from the admittedly covered loss, i.e. fire/smoke, they are not making a coverage decision when they exclude damages flowing from other sources, such as contaminants. The coverage decision in this case has been made by the insurer - damages from fire are covered and damages from other sources are not.

In support of their position, Plaintiffs offer an INS Bulletin issued in 2006-2007 by the State of Michigan, Department of Labor and Economic Growth, Office of Financial and Insurance Services ("OFIS Bulletin"). The OFIS Bulletin states in pertinent part:

> Once an insurer determines that a loss is covered under the subject policy of insurance, and there is a demand for appraisal by the policyholder or insurer, disagreements between policyholders and insurers over factual issues of whether some of the damages claimed by the policy holder are part of the amount of loss caused by the covered event are part of the appraisal process.

(Pls.'s Mot. Ex. J.)

In further support of their position, Plaintiffs cite the unpublished opinion of Judge Quist in

*Olivet College v. Indiana Ins. Co.*, No. 98-cv-821 (W.D. Mich. 1998). In *Olivet*, the college claimed a loss under its policy with Indiana for damage caused by a ruptured steam pipe, a loss that Indiana conceded was a covered loss under the policy. However, damage estimates of the property revealed that there were also items of loss that may have been caused not by the ruptured pipe but by faulty engineering, settling and wear and tear, losses not covered under the policy. Indiana refused to participate in appraisal, claiming that this presented a "coverage" issue that had to be determined by the court before the parties could proceed to appraisal. *Id*. at 9. Judge Quist concluded that the dispute did not present a "genuine" coverage issue but was an issue for the appraiser to determine in calculating the amount of the loss:

> The Court concludes that, under Michigan law, the Court is to determine what is covered and what is not covered under the policy, and the appraisers then determine whether a particular item meets the definition provided by the Court. As the Michigan Court of Appeals explained, the appraisers are to decide "what particular articles or items of property are embraced within the general description fo the property they are to appraise for damages . . . ." The Court in *Kwaiser* further noted that the determination by the appraisers of whether a particular item falls within the general description of the property they are to appraise "reflects the method of determining the loss rather than a matter of coverage." A contrary reading of the appraisal remedy would require this Court to conduct an item-by-item (or crack-by-crack) determination of exactly which losses fall within the scope of coverage and which items are excluded because they were the result of prior causes, a task properly undertaken by the appraisers. In this case, there is not question as to the legal definition of what is covered under the policy - damage caused by the steam release is covered and damage resulting from poor engineering, settling, or wear and tear of the building over time are not covered. Accordingly, the Court will order appraisal of the property damage claim at this time.

*Id*. at 16 (citations omitted). Judge Quist's reasoning appears to the Court to be applicable here – there is no question as to the legal definition of what is covered under the policy, i.e. damage caused by the fire/smoke is covered and damage caused by the contaminants (or other sources) is not covered. The parties agree on this much. Where the insurer has already conceded coverage for the

loss, as State Farm has here, deciding what damages fall into which of the two defined categories seems appropriately addressed by the appraisers, with the help of the air quality experts if the appraisers so choose.[3]

State Farm argues that the Sanit-Air report is a "new claim" that State Farm has denied and that the dispute now is a disagreement over coverage under the policy. State Farm cites several cases for the well-accepted proposition that "the issue of coverage is for the court, not the appraisers." *Auto-Owners Ins. Co. v. Kwaiser*, 190 Mich. App. 482, 487 (1991). "Where the parties cannot agree on coverage, a court is to determine coverage in a declaratory action before an appraisal of the damage to the property." *Id*. That coverage issues are for the court and not the appraisers is beyond dispute. The issue in the instant case, as observed by Judge Quist in *Olivet*, is whether in fact there is a genuine coverage issue.

The Court finds that this case does not present a coverage issue but rather presents a scope-

---

[3] Plaintiffs rely heavily on the unpublished decision of the Michigan Court of Appeals in *Overall Trading, Inc. v. Hastings Mutual Ins. Co*., No. 278859, 2009 WL 103169 (Jan. 15, 2009). In that case, Plaintiffs submitted a single proof of loss relating to two separate claims, a January claim and a February claim. Shortly after the proof of loss was submitted, Hastings denied the January claim because it concluded, after an investigation, that the cause of the loss was surface water infiltration which was not covered under the policy. *Id*. at 5. The court rejected plaintiff's argument that coverage of damages from the January claim was properly considered part of the appraisal process: "Coverage issues can be subject to a court ruling even after an appraisal so long as there was no indication that coverage was conceded or waived by the insurer. Here . . . defendant never conceded coverage for the January claim or waived its right to assert the defense." *Id*. at * 6.

Hastings had denied coverage altogether for damages relating to the January claim because it had concluded that those damages were the result of a loss not covered under the policy. In this respect lies the fundamental difference between State Farm's position and Hastings' position – State Farm conceded coverage of the loss from fire and smoke, and they now contest the extent of damage from that loss noted in the Sanit-Air report, a report that was commissioned by Plaintiffs' appraiser as part of the appraisal process. State Farm continues to plead that "it has never conceded the contamination loss was covered." (Def.'s Resp. 12.) But Plaintiffs do not seek to include contamination damages, an admittedly uncovered loss under the policy, and the appraisers will not be called upon to make a "coverage" determination.

12

of-loss issue on an admittedly covered claim, a subject properly decided by the parties' agreed upon appraisers through the appraisal process. State Farm's own expert characterized the instant dispute as one involving the "scope of remediation." (Def.'s Supplemental Brief in Opposition to Plaintiffs Motions for a Temporary Restraining Order and a Preliminary Injunction, Ex. B, Exponent Report and Lab Results, Dkt. No. 23-3 at 17.) Clearly State Farm and Plaintiffs disagree over the extent of the damages caused by the covered loss, and dispute the amount of remediation necessary to satisfy the obligations under the policy. This is what led the parties to appraisal in the first instance and was magnified by the findings in the Sanit-Air report. But the fact that the Sanit-Air report uncovered damages that potentially relate to causes not covered under the policy (damages as to which Plaintiffs concede they are not entitled to recover) does not convert Plaintiffs' original claim into a *new* claim, as to which State Farm can create the fiction of claim denial and thereby manufacture a "coverage" dispute.

Both parties have now commissioned expert reports to aid their appraisers and any disagreement between the two appraisers ultimately will be decided, under the statutory scheme, by a mutually designated umpire.[4] The Court concludes that this is a classic scope-of-loss issue appropriately resolved through the appraisal process, a statutory procedure in which both parties have agreed to participate. Indeed, this appears to the Court to be precisely the situation that the OFIS Bulletin was issued to address and clarify. The Court agrees with Judge Quist's well-reasoned opinion in *Olivet* and concludes that this case involves issues as to the scope of the damage caused

---

[4] The policy states in part ". . . the appraisers shall then set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of loss. If the appraisers fail to agree within a reasonable time, they shall submit their differences to the umpire. Written agreement by any two of these three shall set the amount of the loss." (Pls.'s Mot. Ex. A.) The statute, MCL § 500.2388(1)(m) dictates the same process.

13

by an admittedly covered loss, an issue appropriately decided in the appraisal process, and that Plaintiffs have a substantial likelihood of succeeding on their claim that State Farm should continue to participate in the appraisal process.

> **2. Ordering State Farm to pay Plaintiffs' ALEs for the two month period necessary to continue and conclude the appraisal process.**

State Farm argues that even if the Court were to order it to participate in the appraisal process, "there is no statutory or legal requirement for an insurer to pay benefits while an appraisal is occurring." (Def.'s Resp. 14.) State Farm does not direct the court to either the legal or the statutory support for this statement and states that "as it does not believe there is any coverage for this claim, it is not inclined to continue making ALE payments while waiting for non-qualified appraisers to issue a coverage determination." (Def.'s Resp. 14-15.) However, as discussed above, the Court concludes that Plaintiffs have a substantial likelihood of succeeding on their argument that they made only one claim, as to which State Farm has conceded liability, and not a "separate" claim as to which State Farm has denied coverage, and that State Farm should be ordered to participated in the appraisal process. Without making any determination as to the value of the ALEs already paid by State Farm, or as to the Plaintiffs' claims for ALEs for the intervening months of April, May, June, July and August, the Court concludes that under the language of the Policy, Plaintiffs would have a substantial likelihood of succeeding on an argument that ALEs are appropriately owed during the two-month period required to complete the appraisal process to which both parties have committed.

With respect to the payment of ALEs, the Policy provides:

Loss of Use
1. Additional Living Expense. When a Loss Insured causes the residence premises to become uninhabitable, we will cover the necessary increase in cost you incur to

14

maintain your standard of living for up to 24 months. Our payment is limited to incurred costs for the shortest of: (a) the time required to repair or replace the premises; (b) the time required for your household to settle elsewhere; or © 24 months. This coverage is not reduced by the expiration of this policy.

Pls.'s Mot. Ex. C, p. 4.)

State Farm submitted to the appraisal process when the parties were unable to agree upon the scope of remediation necessary to repair or replace the premises and agreed at that time to cover Plaintiffs' ALEs in the amount of $4,000 per month for a reasonable period while that process continued. Under these circumstances, where the sufficiency of the repair is currently the subject of an agreed upon appraisal process, it appears likely that State Farm would be obligated under the contract to continue paying ALEs, at least until it could prove that one of the conditions in the policy for discontinuing payment, i.e. completion of repairs, resettling of Plaintiffs elsewhere or 24 months, had occurred. Given the Court's conclusion that Plaintiffs' have a strong likelihood of succeeding on their argument that the appraisal process should continue, they are also likely to succeed on any claim for ALEs during the period required to complete that process, which the parties represent should be accomplished within sixty days. Accordingly, the Court finds that Plaintiffs would have a strong likelihood of succeeding on a claim that State Farm should cover their ALEs for the months of September and October while the appraisal process continues and concludes.[5]

**B. Irreparable Harm**

In establishing the element of irreparable harm, a party seeking an injunction bears a heavy

---

[5] The Court notes that both parties have indicated that the appropriate amount of ALEs for which State Farm may be obligated is itself a proper subject for the appraisers. The Court expresses no opinion on the appropriate amount of ALEs owed by State Farm other than those that are the subject of this Order, that is payment of Plaintiffs' rent of $3,000 and payment for Plaintiffs' rental furniture in the approximate amount of $1,000 per month for a period of sixty days while the appraisal process continues and concludes.

burden and must demonstrate more than an unfounded fear of harm. There must be a showing that the asserted harm is likely to occur:

> In evaluating the harm that will occur depending upon whether or not the stay is granted, we generally look to three factors: (1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided. In evaluating the degree of injury, it is important to remember that [t]he key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (internal citations and quotation marks omitted).

State Farm cites a number of cases for the well-accepted proposition that "harm from the denial of a preliminary injunction is irreparable only if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002). Even loss of such fundamental benefits such as one's job or one's income has been held insufficient to establish irreparable harm. *Id*. at 578. *See also American Postal Workers Union v. United States Postal Service*, No. 09-10856, 2009 WL 2410573 at * 9 (E.D. Mich. Aug. 4, 2009) (noting that lost income, damaged credit, loss of homes and stigmatization are insufficient to establish irreparable harm in the Sixth Circuit). *But see Sayo, Inc. v. Zions First Nat'l Bank*, No. 06-14963, 2006 WL 3240706 at * 2 (E.D. Mich. Nov. 7, 2006) (loss of plaintiff's property, his only remaining asset, at an impending foreclosure sale, constituted irreparable harm).

However, a significant body of case law establishes that "in certain circumstances the 'threat of eviction and the realistic prospect of homelessness constitute a threat of irreparable harm and satisfy the first prong of the test for preliminary injunctive relief.'" *Baumgarten v. County of Suffolk*,

16

No. 07-539, 2007 WL 1490487 at * 5 (E.D.N.Y. Feb. 20, 2007) (citing *Tellock v. Davis*, No. 02-CV-4311, 2002 WL 31433589, at *7 fn. 2 (E.D.N.Y. Oct. 31, 2002) (citing *McNeil v. New York City Housing Authority*, 719 F. Supp. 233, 254 (S.D.N.Y.1989)); *Calvagno v. Bisbal*, 430 F. Supp. 2d 95, 100 (E.D.N.Y.2006) (holding that plaintiffs will suffer irreparable harm by losing their only residence); *In re Slater*, 200 B.R. 491, 495 (E.D.N.Y.1996)). *See also Park Village Apts. Tenants Assoc. v. Mortimer Howard Trust*, No. 09-4780, 2010 WL 431458 at * 3 (N.D. Cal. Feb. 1, 2010) (threat of homelessness and irreparable harm shown where rent increases and defendant's refusal to accept enhanced vouchers threatened eviction with no prospect of alternative low income housing).

Plaintiffs provide the affidavit of Kevin and Carol Smith, indicating that Plaintiffs and their four children must vacate their current rental home within two weeks and that they cannot afford to pay for alternate housing, presenting them with the real prospect of being without a place to live. State Farm does not dispute the Smith's financial affidavit but argues that Plaintiffs' smoke-damaged home is fully repaired and habitable and that Plaintiffs should be forced to move back in to their home. But the issue of habitability, and the satisfactory completion of repairs, is at the very heart of the issue currently the subject of appraisal. The Court is in no position to decide this issue and concludes that Plaintiffs have satisfied the irreparable harm prong of the injunctive relief analysis by offering affidavit support for their claim that they are unable to afford alternate housing for the two month period required to continue and conclude the statutory appraisal process.

**C.  Harm to Others and Public Interest**

State Farm does not address either of these prongs of the injunctive relief test and Plaintiffs argue that the balance of harm tips in their favor, i.e. they stand to suffer much greater harm than

State Farm, who will be required only to pay two months' ALEs, that they may ultimately recover (with interest) if they prevail. By contrast, Plaintiffs argue, the specter of being without a place to live presents them with a whole host of potential "severe economic, emotional and possibly physical harm." (Pls.'s Mot. 6-7.)

IV. **CONCLUSION**

The Court concludes that Plaintiffs have a strong likelihood of success on the merits of their claims that State Farm should be ordered to continue the appraisal process and should pay Plaintiffs' ALEs during the two-month period during which that process will continue and conclude. The Court further finds that Plaintiffs have presented evidence that the they face an imminent and real threat of being without an alternate housing option if the Court does not order State Farm to pay their ALEs during the two-month period required to continue and complete the appraisal process. Finally, the Court concludes that the balance of harm tips in favor of granting in part Plaintiffs' request for injunctive relief.

Accordingly, the Court grants Plaintiffs partial injunctive relief and orders (1) that the parties return to the appraisal process and (2) that State Farm pay two months' of Plaintiffs' ALEs, specifically $3,000/month for rent and approximately $1,000/month for rental furniture, the first payment to be made directly to Plaintiffs' landlord and rental furniture provider on or about August 20, 2010.

IT IS SO ORDERED.

                                            S/Paul D. Borman
                                            PAUL D. BORMAN
                                            UNITED STATES DISTRICT JUDGE

Dated: August 17, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on August 17, 2010.

                                                S/Denise Goodine
                                                Case Manager